55 Wn.2d 77 (1959)
346 P.2d 164
JORDIS RANWAY LUNDBERG et al., Appellants,
v.
THE CORPORATION OF CATHOLIC ARCHBISHOP OF SEATTLE, Respondent.[1]
No. 34978.
The Supreme Court of Washington, Department One.
November 12, 1959.
Elliott, Lee, Carney & Thomas, for appellants.
George R. Stuntz and Jonson & Jonson, for respondent.
OTT, J.
The Corporation of Catholic Archbishop of Seattle, hereinafter referred to as the owner, employed Johnston-Campanella, hereinafter referred to as the architects, to prepare plans and specifications for the construction of a church, convent, school, and rectory near Kirkland. The architects employed Ruskin Fisher & Associates, hereinafter referred to as the engineer, to perform the necessary engineering work, as well as to establish elevations and grades for a gravity-flow sewer system from the buildings, when constructed, to connect with a designated trunk line of the Kirkland sewer system. The elevations and grades furnished by the engineer were shown on the plans and specifications which were given to contractors for their preparation of bids.
The owner contracted with various contractors separately for the construction of the buildings, the plumbing, and the sewer system. There was to be no general contractor in charge of the overall construction work. Because of the owner's method of accomplishing its building program, the contracts provided that each contractor was to co-ordinate his work with that of the others. The architects had general supervision, inspection, and approval of the work of the various contractors.
During the construction of the rectory, referred to as Unit D, it became necessary to lower the elevation of the building below that shown in the architect's plans. This change necessitated lowering the elevation of the outfall from Unit D to the sewer accordingly. The structural change was completed and in place prior to the date of letting the contract for the construction of the gravity-flow sewer system.
*79 When the owner asked for bids for the construction of the sewer system, it furnished the prospective bidders with a copy of the engineer's original plans, which indicated the higher elevation for Unit D as originally designed, and did not indicate the lower elevation as Unit D was then actually constructed. The Lundberg Construction Company, hereinafter referred to as the contractor, was the successful bidder.
The sewer construction contract provided, inter alia, that the contractor was to construct the main line in the street and connect the units to the main line at the owner's property line, and that the main line was to connect with the city of Kirkland's trunk-line system. The locations of the feeder lines from the buildings were to be shown by stakes on the property line at the end of each side sewer. In this regard, the contract provided:
"SPECIAL CONDITIONS ... Article 13. Side Sewers. The Contractor shall connect all side sewers into the sewer main. The location of the side sewers shall be shown by a stake on the property line at the end of the side sewers."
The contract further provided:
"Art. 35. SEPARATE CONTRACTS.  The Owner reserves the right to let other contracts in connection with this work. The Contractor shall afford other contractors reasonable opportunity for the introduction and storage of their materials and the execution of their work, and shall properly connect and coordinate his work with theirs.
"If any part of the Contractor's work depends for proper execution or results upon the work of any other contractor, the Contractor shall inspect and promptly report to the Architect any defects in such work that render it unsuitable for such proper execution and results. His failure so to inspect and report shall constitute an acceptance of the other contractor's work as fit and proper for the reception of his work, except as to defects which may develop in the other contractor's work after the execution of his work.
"To insure the proper execution of his subsequent work the Contractor shall measure work already in place and shall at once report to the Architect any discrepancy between the executed work and the drawings." (Italics ours.)
*80 One of the special conditions of the contract provided that the grade elevations shown in the plans were to be followed:
"2. EXCAVATION
"A. General
"The Contractor shall do all excavation of whatever substances encountered to depth shown on drawings. Excavated materials not required for fill or backfill shall be removed from site as directed by the Engineer and disposed of by the Contractor.
"Excavation for manholes and other accessories to have 12-inch minimum and 24-inch maximum clearance on all sides.
"Excavation shall not be carried below the required level.
"Excess excavation below required level shall be backfilled at the Contractor's expense with earth, sand, gravel, or concrete, as directed by the Engineer, and thoroughly tamped." (Italics ours.)
A further special condition relating to the surveys and grade elevations was as follows:
"Article 1. Surveys, Lines, and Grades
"The Contractor will make his own surveys and establish his own grades after the Engineer furnishes the basic bench marks."
May 31, 1957, the contractor called the architects to determine the location of the line for the main sewer and was advised by them that it would be necessary for him to determine the proper location and grade for the gravity-flow sewer (article 1, supra). The contractor told the architects that he was not aware that his contract with the owner required him to provide placement or grade elevations, and that he had not included any engineering costs in his bid. Because of the contractor's oversight in this regard, the owner contributed ninety dollars toward the contractor's engineering expense.
Thereafter, the contractor employed the same engineer that the owner had previously employed for the preparation of the original plans to give him the proper location and grade stakes for the sewer line. Although the outfall from Unit D had been lowered and was then in place, this structural change was apparently disregarded.
*81 By June 17th, the contractor had constructed the main sewer line from the Kirkland trunk line to the street intersection of 120th avenue N.E., which was adjacent to the newly constructed buildings, and which street was to contain the vital main sewer line to which the laterals from the building units, including Unit D, were to be attached. The contractor observed that there were no location stakes at the property line, as required by article 13. He contacted the persons in charge of the construction of the various units to ascertain the sewer locations and outfall elevations. When he contacted the person in charge of Unit D, he was advised that the outfall elevation then in place was "pretty deep." The record indicates that it would have required approximately one hour's work for the contractor to have ascertained precisely how deep "pretty deep" was. However, he did not "measure work already in place," but, instead, constructed the main sewer line pursuant to the elevations and grades as shown on the owner's original plans and drawings.
On June 19th, when putting the feeder line connections in place, the contractor discovered that he had constructed the main line too high for gravity flow from Unit D. The contractor connected the remaining units, and left the job without furnishing any sewer connection for Unit D.
When the owner refused to pay the full contract price, the contractor filed a labor lien against the property. The owner constructed a separate gravity-flow line for Unit D at a cost of $2,578.80, deducted this amount from the contract price, and tendered the balance to the contractor.
The contractor brought this action to foreclose the lien and to recover the amount withheld (less $46.58, the estimated cost of connecting Unit D), contending that he had constructed the sewer system in accordance with the plans and specifications furnished to him by the architects at the time of the bid, and that the contract was performed in a workmanlike manner. The owner's answer denied liability and alleged that the work had not been performed in a workmanlike manner.
*82 Upon evidence substantially as above indicated, the trial court found for the owner, and the contractor has appealed.
The appellant contends that the court erred in entering its findings of fact Nos. 7, 8, and 9, for the reason that certain portions thereof are not supported by the evidence. The questioned findings are as follows:
Finding of fact No. 7: "That since the side sewers had not been constructed by defendant as provided in plaintiffs' contract, plaintiffs' and defendant's architects, Johnston-Campanella, verbally agreed upon a departure from the contract. That instead of plaintiff [sic] undertaking to connect the side sewers as marked by defendant with stakes or other devices, the plaintiffs were to proceed prior to the installation of side sewers. The architects' and plaintiffs' agreement regarding this departure involved the substitution of an acceptable method for determining grade and location of side sewers. The method agreed to be substituted was that the plaintiffs would employ the surveyor who had previously been commissioned by the defendant for the engineering and surveying work on the main job. The surveyor was to determine for the plaintiffs the grade and location by survey and computation, with reference to status of construction as it then stood rather than to await the installation of the side sewer. The surveyor did his work and reported to plaintiffs and plaintiffs proceeded promptly to bring in their crew and expensive equipment and proceed with the work. That the main line sewer was installed according to the line and grade established in the original design plan."
Finding of fact No. 8: "On completion of the installation of the main sewer line, the sewer was covered. It was then discovered by all of the parties that it was impossible to connect the side sewers to Unit D to the main line sewer as installed by the plaintiffs at the point desired to be connected. It was impossible because the sewer line at that particular point, which was the shortest and most direct route from the building to the sewer line was too high so that the only way it could be connected at that point would be to install a pump to raise the sewage from the side sewer up into the main sewer line.
"That the defect in the grade elevation was caused by the negligence of the defendant's architect. The architect negligently computed a critical grade level upon which the plaintiffs and surveyors relied and upon which they *83 had a right to rely, and the architect knew that they were going to rely thereon and it was so intended. That the architect, in making substitute arrangements, acted without authority of the owner, namely the defendant. That accordingly, the architect rather than the defendant is responsible for the error.
"That prior to laying of the main line on 120th, plaintiffs were told that sewer outfall in Unit D was low."
Finding of fact No. 9: "That, but for the error aforementioned, there would have been due and owing the plaintiffs the sum of $2,519.70. That the defendant corporation had to employ another side sewer contractor to run a side sewer over a longer distance at a cost, including engineering, of $2,578.80, which resulted in an inferior system for defendant."
[1] The pleadings in this cause did not raise any issue concerning the theory upon which the trial court decided the case, namely, that the architects exceeded their authority, as agent of the owner, by entering into the substitute agreement. Nor is there any evidence in the record to support a finding that the architects did, in fact, exceed their authority. The trial court, therefore, decided the cause upon a theory not pleaded or proved. A new trial must be granted, unless the trial court's judgment can be sustained upon any other theory within the pleadings and established by the proof.
The action arises out of a contract for the construction of a gravity-flow sewer system. The appellant contends, by its pleadings, that it performed the contract and is entitled to be paid. The respondent's pleadings deny that appellant fully performed the contract, and allege that the respondent is entitled to offset, from the contract price, its cost in having the contract fully performed.
[2] On the issues thus raised, appellant contends that the contract was ambiguous, in that, under the section of the contract dealing with excavations, "The Contractor shall do all excavation ... to depth shown on drawings," while article 1 states that he "will make his own surveys and establish his own grades ..." (Italics ours.)
Conceding, arguendo, that the provisions are ambiguous, *84 the ambiguity was resolved between the parties before the vital main line on 120th avenue N.E. was constructed. The contractor assumed the contractual requirement of establishing his own grades (special condition, article 1), when he employed an engineer as his agent for this purpose and accepted from the owner a contribution toward defraying his engineering expense. Thereafter, the establishment of proper placement and grade elevations for the gravity-flow sewer system was solely the responsibility of the contractor, and the contractual inconsistency or ambiguity was entirely removed.
[3] Appellant next contends that his engineer was misled by the elevations shown on the original plans, and that the engineer, at the time he was ordered to make the survey for the contractor, had a right to rely thereon. We do not agree. The elevations shown on the plans were the same elevations that appellant's engineer had furnished to the respondent owner to be used in the drawings when the building program was under consideration, and before construction work had commenced.
When the engineer was employed by the contractor to furnish him with proper elevations for a gravity-flow sewer system to serve the buildings already erected, the engineer, acting as agent for his principal, was required by the contract to "measure work already in place." This measurement was never made by the contractor, and, if it was made by his agent, the engineer, the record does not indicate whether the result of the measurement was ever communicated to the appellant contractor. It must be conceded that, had the required measurement been timely made, the lower elevation of the outfall from Unit D would have been apparent, and the main sewer line in 120th avenue N.E. could have been lowered accordingly.
[4] The evidence supports respondent's pleadings and contention that the contractor did not perform the contract in accordance with its terms and failed to complete it as to Unit D.
*85 [5] We are committed to the rule that we will sustain the trial court's judgment upon any theory established by the pleadings and supported by the proof. Guerin v. Thompson, 53 Wn. (2d) 515, 519, 335 P. (2d) 36 (1959).
The judgment is affirmed.
ROSELLINI, FOSTER and HUNTER, JJ., concur.
MALLERY, J., dissents.
February 2, 1960. Petition for rehearing denied.
NOTES
[1] Reported in 346 P. (2d) 164.